UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

DAVID A. GIEBEL,                                    Case No. 08-CV-6294 (PJS/FLN)

        Plaintiff,

v.                                                                          ORDER

UNION PACIFIC RAILROAD COMPANY,

        Defendant.

---

    Richard A. Haydu, HOEY & FARINA, and William R. Space, LAW OFFICE OF WILLIAM R. SPACE, for plaintiff.

    Leslie A. Gelhar, DONNA AND HURLEY PC, for defendant.

    Plaintiff David A. Giebel was employed by defendant Union Pacific Railroad Company ("Union Pacific") as a conductor. Giebel was injured when a door to a bathroom on a locomotive suddenly slammed on his hand while the locomotive was rocking side to side on uneven track. Giebel brings several claims against Union Pacific, and Union Pacific moves for summary judgment on some of those claims. For the reasons given below, Union Pacific's motion is granted.

## I. BACKGROUND

    Giebel worked as a conductor for Union Pacific. On December 21, 2005, Giebel was assigned to a pusher job, which required Giebel and his crew to attach their locomotive to the back of a coal train and push the train uphill from the St. Paul train yard to a power plant in Bayport, Minnesota. Giebel Dep. at 59-62. Shortly after hooking onto the coal train, Giebel entered the locomotive, set down his gear, and went to use the locomotive's bathroom. *Id*. at 65. He opened the bathroom door and entered. *Id*. at 73. The bathroom was very small. Because

Giebel did not have room to turn around, he closed the bathroom door by reaching back with his left hand, grabbing the handle, and pulling the door shut. *Id*. at 76. While Giebel was using the bathroom, the locomotive began to move, *id*. at 127-28 — and, as the locomotive moved over a rough stretch of track, it shook vigorously from side to side. *Id*. at 89.

The latch on the bathroom door held the door securely in place while Giebel was using the bathroom. *Id*. at 74. When Giebel was done, he again reached back with his left hand and flipped the latch's lever to open the door. *Id*. at 77-78. As he did so, the handle "rip[ped] right out of" his hand. *Id*. at 93. The door swung open and then immediately slammed shut, trapping Giebel's left hand between door and jamb. *Id*. at 77. It is the opinion of Giebel's expert witness, Alan J. Blackwell, that "rough jointed track conditions" caused the train to "sway[] laterally back and forth violently" and that "[t]he magnitude of the side-to-side movement of the locomotive caused the restroom door to slam shut against [Giebel's] hand." Blackwell Report at 1, Gelhar Aff. at Ex. C [Docket No. 16].

The force of the bathroom door slamming against Giebel's hand resulted in fractures to and partial amputation of Giebel's fingers. Giebel claims that his injuries make it impossible for him ever again to work as a conductor and cause him pain every day. Giebel Dep. at 35, 100. Moreover, since the accident, Giebel has struggled with depression, *id*. at 43, and his pre-existing bipolar disorder has been exacerbated, *id*. at 43-44.

Giebel filed this lawsuit in December 2008. Giebel claims, among other things, that Union Pacific violated the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 et seq., because the locomotive was not in proper condition and safe to operate, and that Union Pacific violated the Federal Employers' Liabilty Act ("FELA"), 45 U.S.C. § 51 et seq., because the

railroad failed to maintain a safe workplace. Union Pacific has moved for partial summary judgment. Union Pacific argues that Giebel's LIA claim should be dismissed in its entirety and that Giebel's FELA claim should be dismissed insofar as it relies on the railroad's failure to replace the jointed-rail track that existed at the site of Giebel's accident with continuous-welded rail ("CWR"). According to Union Pacific, that particular FELA claim is precluded by another federal law — the Federal Railway Safety Act ("FRSA"), 49 U.S.C. § 20106(a)(2).

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Locomotive Inspection Act Claim

The LIA (formerly known as the Boiler Inspection Act) prohibits a railway carrier from using a locomotive unless the locomotive and its appurtenances "are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701. If an employee of a railroad is injured as the result of a LIA violation, the railroad is strictly liable under the FELA for the resulting harm. *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 299 (1996).

There are two ways that a railroad can violate the LIA. The first way is by failing to comply with a regulation issued by the Federal Railroad Administration ("FRA") regarding the safety of locomotives. *Id.*; *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987), *cert. denied*, 484 U.S. 851 (1987). Giebel claims that Union Pacific failed to comply with an FRA regulation that requires that "[c]ab doors shall be equipped with a secure and operable latching device." 49 C.F.R. § 229.119(a). But Union Pacific plainly did not violate this regulation. As Giebel himself admitted at his deposition, the door on the locomotive bathroom was equipped with a secure and operable latch:

> Q   Did the latch on the bathroom door work?
>
> A   Yes.
>
> Q   It — and by "work," I mean it securely held the bathroom door in place?
>
> A   Yes.

Giebel Dep. at 74. After Giebel closed the bathroom door, it did not open again until he "flipped the lever" on the latch to exit. *Id*. at 77.

Although Giebel admits that the bathroom door was not defective in any way, he suggests that Union Pacific should have installed a dampener to slow the speed of the door as it closed. *Id*. at 93. But Giebel has pointed to no federal regulation that requires installation of dampeners on cab doors. In short, Union Pacific did not violate a federal regulation regarding the locomotive or its appurtenances.

The second way that a railroad can violate the LIA is by "breach[ing] the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate

without unnecessary peril to life or limb." *McGinn,* 102 F.3d at 299. Two kinds of claims have been found to implicate this duty: failure-to-install claims and failure-to-maintain claims.

Failure-to-install claims, as the name suggests, arise when a railroad does not install a particular safety feature on a locomotive. A railroad is not required to install a piece of equipment merely because it might make a locomotive safer. *Id*. Rather, a railroad will incur liability under the LIA only if it fails to install equipment that either (1) is required by federal regulation or (2) constitutes "an integral or essential part of a completed locomotive." *S. Ry. Co. v. Lunsford*, 297 U.S. 398, 402 (1936). As noted, no federal regulation requires installation of door dampeners, and Giebel does not contend that a dampener is "an integral or essential part" of a locomotive. If he did make such an argument, the Court would reject it. *See, e.g., King v. S. Pac. Transp. Co.*, 855 F.2d 1485 (10th Cir. 1988) (armrests are not integral or essential); *Mosco*, 817 F.2d 1088 (bars, grates, and other protective window devices are not integral or essential); *McGinn*, 102 F.3d 295 (luggage racks are neither integral nor essential). Union Pacific therefore cannot be held liable under a failure-to-install theory.

Failure-to-maintain claims, by contrast, arise when a part or appurtenance is installed but is not "maintained in good repair at all times." *Herold v. Burlington N. Inc.*, 761 F.2d 1241, 1246 (8th Cir. 1985). If a railroad chooses to install a piece of equipment that is not required — because the equipment is not mandated by a federal regulation and does not constitute an integral or essential part of a locomotive — then the railroad must properly maintain that piece of equipment. If it fails to do so, and injury results, the railroad can be held liable for violating the LIA.

In his brief, Giebel argues that "Union Pacific failed to maintain the bathroom door in good repair and in a safe and proper condition." Giebel Br. 7. But Giebel himself admits that the door was in no way defective. Giebel Dep. at 93. Indeed, one of his experts, Colon Fulk, asserts that Giebel's injury was *not* caused by a defect in the bathroom door, because the door "did exactly as it was designed, it opened and closed," Fulk Report at 4, Gelhar Aff. at Ex. B. There is no evidence that Union Pacific failed to maintain the bathroom door in good repair at all times.

Giebel argues, though, that the bathroom door was not maintained in good repair because Union Pacific did not install a dampener on the door. In so arguing, Giebel is simply trying to disguise a failure-to-install claim as a failure-to-maintain claim. Federal courts have strictly limited failure-to-install claims. As noted, a railroad can be held liable for failing to install a piece of equipment that is not an integral or essential part of a locomotive only if the railroad's omission violates a federal regulation. To permit plaintiffs such as Giebel to recover based on the argument that a locomotive was not properly *maintained* because a piece of non-essential equipment was not *installed* would render meaningless the limits on failure-to-install claims — particularly because, with a few strokes of a pen, just about any failure-to-install claim could be pleaded as a failure-to-maintain claim.

The bottom line is that no federal regulation required installation of a dampener on the bathroom door, a bathroom-door dampener is not an integral or essential part of a locomotive, and the bathroom door that slammed into Giebel's hand was maintained in good repair at all times. Union Pacific is not liable for violating the LIA.

## C. Federal Employers' Liability Act Claim

The FELA essentially provides that a railroad engaging in interstate commerce is liable for any injury to an employee caused by the railroad's negligence. 45 U.S.C. § 51; *Wabash R.R. Co. v. Hayes*, 234 U.S. 86, 89 (1914).

> [The] FELA imposes on railroads a general duty to provide a safe workplace. To establish that a railroad breached its duty to provide a safe workplace, the plaintiff must show circumstances which a reasonable person would foresee as creating a potential for harm. The plaintiff must then show that this breach played any part, even the slightest, in producing the injury.

*McGinn*, 102 F.3d at 300 (internal citations omitted).

Giebel alleges that Union Pacific was negligent, and thus liable under the FELA, for three reasons: (1) because it failed to properly maintain its track; (2) because it failed to properly maintain its locomotives; and (3) because it failed to properly maintain or secure its doors. Compl. ¶ 13. Union Pacific has moved for summary judgment on only the first of these claims — and, indeed, on only one particular *aspect* of the first of these claims. Giebel contends that one of the ways in which Union Pacific failed to properly maintain its track was by failing to replace the jointed-rail track that existed at the site of Giebel's injury with CWR. Blackwell Report at 13, Gelhar Aff. at Ex. C. Union Pacific moves for summary judgment on that particular contention, arguing that, to the extent that Giebel's FELA claim is based on Union Pacific's failure to install CWR, that claim is precluded by the FRSA.

Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the

extent practicable." 49 U.S.C. § 20106(a)(1). To achieve this goal of national uniformity, the FRSA provides that "[a] state may adopt or continue in force a law, regulation, or order related to railroad safety" only "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). Once the Secretary prescribes such a regulation or order, the state "law, regulation, or order" is preempted. To preempt a state-law claim regarding a particular subject matter (such as track maintenance), a federal regulation or order must do "more than . . . 'touch upon' or 'relate to' that subject matter." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). A state-law claim is preempted under the FRSA "only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id*.

The FRSA contains two savings clauses. The first savings clause provides that, even if a state law would otherwise be preempted under the FRSA, "[a] State may adopt or continue in force an additional or more stringent law . . . related to railroad safety" if (1) the state law "is necessary to eliminate or reduce an essentially local safety or security hazard," (2) the state law is compatible with federal law, and (3) the state law does not unreasonably burden interstate commerce. 49 U.S.C. § 20106(a)(2). The second savings clause provides that a state-law claim is not preempted if it is based on a railroad's failure to comply with (1) a federal regulation; (2) a plan created by the railroad itself pursuant to federal law; or (3) a state law that is enforceable under the first savings clause. 49 U.S.C. § 20106(b).

By its terms, the FRSA preempts only *state-law* causes of action. Giebel is, of course, bringing a *federal-law* cause of action under the FELA. But the federal courts have consistently held that "the uniformity demanded by the FRSA 'can be achieved only if [federal rail safety

regulations] are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim.'" *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 430 (6th Cir. 2009) (quoting *Lane v. R. A. Sims, Jr., Inc.,* 241 F.3d 439, 443 (5th Cir. 2001); *see also Waymire v. Norfolk & W. Ry. Co.,* 218 F.3d 773, 776 (7th Cir. 2000). Accordingly, Giebel's FELA claim is precluded by the FRSA if the same claim, brought as a state-law negligence claim, would be preempted. *See Nickels*, 560 F.3d at 430.

The burden is on Union Pacific to show that federal law substantially subsumes the subject matter of the state-law equivalent of Giebel's FELA claim. *See Duluth, Winnipeg and Pac. Ry. Co. v. City of Orr*, 529 F.3d 794, 797 (8th Cir. 2008). If that showing is made, the burden shifts to Giebel to prove that, because an equivalent state-law claim would fall within one of the FRSA's two savings clauses, Giebel's FELA claim is not precluded. *Id*.

Federal regulations extensively regulate the construction and maintenance of railroad track. The Administrator of the FRA, acting under authority delegated by the Secretary of Transportation (*see* 49 C.F.R. § 1.49(m)), has promulgated numerous regulations "prescrib[ing] minimum safety requirements for railroad track that is part of the general railroad system of transportation." 49 C.F.R. § 213.1(a). The regulations contained at 49 C.F.R. Pt. 213 describe minimum safety standards as they relate to conditions of the railway roadbed, track geometry, track structure, track appliances, track-related devices, and compliance inspection. If at any time an owner becomes aware that a portion of track is not in compliance with any requirement of Part 213, the owner must "[b]ring the track into compliance," "[h]alt operations over that track," or only "[o]perate under authority" of a person who has been designated as being able to "safely compensate for deviations" from the various minimum safety requirements. 49 C.F.R.

§§ 213.5(a); 213.7(a). Noncompliance with the construction, maintenance, and inspection standards contained at Part 213 may subject an owner to monetary and criminal penalties. 49 C.F.R. §§ 213.5(d); 213.15.

Although federal regulations say a great deal about railroad track generally, they say relatively little about CWR specifically. Part 213 contains only three regulations that specifically address CWR. First, § 213.118 provides that a railroad that chooses to install CWR track "shall have in effect and comply with a plan" for the installation, adjustment, maintenance, and inspection of CWR; the regulation also provides for FRA review and approval of that CWR plan. Second, § 213.119 describes the required elements of a plan that applies to CWR track categorized as Class 1 through Class 5. Third, § 213.343 adapts the elements described in § 213.119 for a plan that applies to CWR track categorized as Class 6 or higher. No FRA regulation *requires* any railroad to install CWR in place of jointed rail, nor does any FRA regulation list the factors that a railroad must consider when deciding whether to install CWR.

Giebel argues that the FRA's relative silence regarding CWR suggests that the agency does not intend to preempt or preclude claims that a railroad had a duty under state negligence laws to install CWR. The Court disagrees. "[A] regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter." *In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005). "'Generally, determining the safety concerns that a state or federal requirement is aimed at will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue. Otherwise a state law could be preempted only if there were an identical federal regulation, and . . . *Easterwood* teaches that this is not so.'" *BNSF Ry. Co. v. Swanson*, 533 F.3d 618, 622 (8th

Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. Doyle,* 186 F.3d 790, 796 (7th Cir. 1999)). *Easterwood* involved federal regulations that dictated, in connection with federally-funded projects, the devices to be installed at grade crossings and the means by and extent to which the railroad could participate in their selection. *Easterwood*, 507 U.S. at 671. The Supreme Court held that those regulations covered the railroad's common-law duty "to identify and/or repair dangerous crossings." *Id*.

A number of plaintiffs have brought negligence claims against railroads for their alleged negligence in using ballast that was too large. In seeking to avoid preemption under the FRSA, these plaintiffs have stressed that no FRA regulation specifically prescribes the size of ballast. Yet courts have nevertheless found these "negligent-ballast" claims to be preempted or precluded by the FRSA. *See, e.g., Nickels*, 560 F.3d 426, *Norris v. Cent. of Georgia R.R.*, 635 S.E.2d 179 (Ga. App. 2006); *Munns v. CSX Transp., Inc.*, No. 3:07CV2507, 2009 WL 1514603 (N.D. Ohio 2009). For example, in *Nickels*, the plaintiff sought to recover for injuries caused by years of walking on oversized track ballast located in areas where railway industry groups recommended that smaller ballast be used. 560 F.3d at 428. The Sixth Circuit held that an FRA regulation that required that all railroad track be supported by track ballast that satisfied certain structural functions subsumed the subject of ballast. *Id*. at 431. The court further held that the agency had left the issue of ballast size to the discretion of individual railroads, so long as the ballast they selected served the support functions described in the regulation. *Id*.

For similar reasons, the Court concludes that the FRA regulations at 49 C.F.R. Pt. 213 cover the subject matter of Giebel's claim. Although federal regulations do not expressly address whether or when jointed rail should be replaced with CWR, those regulations do establish

minimum requirements for the construction and maintenance of railroad track, impose inspection requirements to ensure that railroads are adhering to those minimum safety standards, and prescribe a variety of consequences for a railroad that permits its track to fall out of compliance with those minimum safety standards. Clearly, then, FRA regulations cover the subject matter of track construction and maintenance. *See Mehl v. Canadian Pac. Ry., Ltd.*, 417 F. Supp. 2d 1104, 1117 (D. N.D. 2006). Moreover, the regulations leave little doubt that the FRA is well aware of CWR and has made a conscious decision to give railroads the freedom to decide for themselves whether and when to install it. To allow the decisions of railroads to be second-guessed by thousands of state and federal trial courts applying federal common law and the common law of the 50 states would pose a grave threat to the national uniformity prescribed by the FRSA. 49 U.S.C. § 20106(a)(1).

For that reason, the Court holds that Giebel's FELA claim is precluded insofar as Giebel seeks to recover for Union Pacific's alleged negligence in failing to replace its jointed-rail track with CWR. The Secretary of Transportation has prescribed regulations "covering the subject matter" of track construction and maintenance, 49 U.S.C. § 20106(a)(2), and thus Giebel's claim for negligent track construction and maintenance is precluded unless it falls within one of the FRSA's two savings clauses. It does not fall within either clause.

The first savings clause, found at 49 U.S.C.§ 20106(a)(2), applies only to regulations "necessary to eliminate or reduce an essentially local safety or security hazard." 49 U.S.C. § 20106(a)(2)(A). As *Easterwood* explained, this provision does not save common-law negligence claims (or their FELA equivalents), because such claims apply "a general rule to

address all hazards caused by lack of due care, not just those owing to unique local conditions."
*Easterwood*, 507 U.S. at 675.

The second savings clause, found at 49 U.S.C. § 20106(b), provides that a personal-injury claim will not be preempted to the extent that it alleges a railroad has failed to comply with a federal regulation; has failed to comply with a plan, rule or standard created pursuant to a federal regulation; or has failed to comply with a law that remains enforceable pursuant to § 20106(a)(2). Giebel has not alleged that Union Pacific violated any federal regulation by failing to install CWR; that Union Pacific violated any plan, rule, or standard created pursuant to a federal regulation; or that Union Pacific violated a state law that falls within the first savings clause. Kodesh Aff. ¶ 4 [Docket No. 17]. Consequently, Giebel's FELA claim is precluded insofar as it is based on Union Pacific's failure to install CWR.

Giebel has suggested that Union Pacific acted negligently in other ways in maintaining its track — that is, in ways other than by failing to replace the jointed-rail track with CWR. For some reason, Union Pacific did not move for summary judgment on these "other" track-maintenance claims. But as this opinion has hopefully made clear, the Court has grave doubts that *any* claim against Union Pacific arising out of its alleged negligence in constructing or maintaining its track can survive preclusion under the FSRA. The Court asks the parties to be prepared to address this issue at the pretrial conference.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, defendant Union Pacific Railroad Company's motion for partial summary judgment [Docket No. 20] is GRANTED. Accordingly, IT IS HEREBY ORDERED THAT:

1. Plaintiff David A. Giebel's claim that defendant Union Pacific Railroad Company violated the Locomotive Inspection Act is DISMISSED WITH PREJUDICE AND ON THE MERITS; and

2. Plaintiff David A. Giebel's claim that defendant Union Pacific Railroad Company is liable under the Federal Employers' Liability Act for failing to replace its jointed-rail track with continuous-welded rail is DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated: May 11, 2010	  s/Patrick J. Schiltz
	Patrick J. Schiltz
	United States District Judge